Betty L. THOMPSON, Plaintiff,

v.

Richard S. SCHWEIKER, Secretary of Health and Human Services, Defendant.

No. 82–0451–CV–W–1.

United States District Court, W.D. Missouri, W.D.

Jan. 31, 1983.

W. Dudley Leonard, Independence, Mo., for plaintiff.

Robert G. Ulrich, U.S. Atty., F.O. Griffin, Jr., Asst. U.S. Atty., Kansas City, Mo., for defendant.

MEMORANDUM AND ORDERS RE-VERSING FINAL DECISION OF SECRETARY AND DIRECTING PAYMENT OF BENEFITS

JOHN W. OLIVER, Senior District Judge.

This Social Security case again requires the Court to review the Secretary's applica-tion of its regulatory framework for the finding of total disability to the facts of an individual case. *See* the "Listing of Impair-ments" codified in Appendix I to Subpart P of Part 404, 20 C.F.R. §§ 404.1501 *et seq.* (1981). The principles stated in *McCoy v. Schweiker,* 683 F.2d 1138, 1149 (8th Cir. 1982) (en banc) are applicable to this case.

We conclude, for reasons to be stated in detail, that the Secretary's final decision does not reflect the "large measure of indi-vidualized adjudication" necessary for prop-er application of its regulations and is not supported by substantial evidence in the record as a whole. The decision will there-fore be reversed and the case remanded with directions to distribute widow's insur-ance benefits to plaintiff.

I.

Plaintiff filed her application for widow's insurance benefits under Title II of the Social Security Act, 42 U.S.C. §§ 401 *et seq.,* on May 18, 1981. It was considered and denied on July 24, 1981. Reconsidera-tion resulted in affirmance on August 27, 1981. Plaintiff requested a hearing, which was held on October 28, 1981. She was not represented by counsel at the hearing.[1] On November 20, 1981, the Administrative Law Judge (ALJ) rendered his finding that the claimant was not disabled within the mean-ing of the Social Security Act. On March 19, 1982, the Appeals Council affirmed the ALJ's decision, which thus stands as the final decision of the Secretary under 42 U.S.C. § 405(g).

Plaintiff was born on March 30, 1930. Her application for widow's insurance bene-fits stated that her husband died of a heart attack in June, 1975 and that she became

---

1. When advised by the ALJ of her right to have counsel present and that she would be giving up that right for purposes of the hearing, plain-tiff replied: "I didn't mind. In the first place, I can't afford an attorney. But in the second place, I don't think an attorney—I could tell him how I feel and he could go through those records and he still wouldn't know." Tr. at 16. Plaintiff is represented by counsel in this Court.

The administrative hearing was conducted in Daytona Beach, Florida. According to her ap-plication, tr. at 47, plaintiff was then a resident of DeLand, Florida. The complaint states that plaintiff is currently a resident of Independ-ence, Jackson County, Missouri. That allega-tion is admitted by defendant in its answer.

totally disabled on March 30, 1980. Tr. at 44, 46. In a "disability report" filed by plaintiff concurrently with her application for benefits on May 18, 1981, plaintiff described her condition as "muscle pain and weakness pain in joints, disease localized in shoulders, elbows & wrists and left knee, right hip moves to different parts of skeletal system, feet, rib cage, back, neck." Tr. at 63. She stated that her condition began to bother her in 1977 but she finally quit work on March 30, 1980 because "muscle became weaker. Couldn't move arms and lift weight. Condition gets worse as it progresses." [2]

Plaintiff was the only witness at her administrative hearing. She testified that she worked as a hairstylist some sixteen years ago, afterwards served as a receptionist for her husband, a general surgeon, until his death in 1975 and most recently worked as "a tester in electronics" for a year, but had to quit because "I just couldn't get the arms and legs to function. And the pain was so severe." Tr. at 23. She testified that she takes demerol, up to two or three a day, for pain and "Then, I'll take them because they make me sick." Tr. at 26. She further testified that she takes 12 bufferin a day and periodically receives cortisone shots in her shoulder; that her hands and feet swell; and that she takes nitroglycerin for chest pain which sometimes interferes with her breathing and numbs her left arm. Plaintiff testified that Dr. Irwin Leider is her treating physician for hypertension and angina pectoris and that he examines her every six months and administers EKGs, but without the stress test. Tr. at 29.[3] She testified that she has been examined by several doctors for joint pain and swelling, but they disagreed on a diagnosis.

Plaintiff's medical records from Halifax Hospital indicate that plaintiff was initially admitted on January 14, 1980 and discharged on January 19, 1980. Her treating physician, Dr. Michael Kohen, diagnosed her condition as follows:

# 1. Acute episode of chest pain.

# 2. Probable rheumatoid arthritis.

# 3. Asthma, exercise induced, allergic and infectious.

# 4. Perennial and seasonal allergic rhinitis and conjunctivitis.

# 5. Sinus headaches with post nasal drainage.

# 6. Hiatal hernia.

# 7. Hypertension.

# 8. Allergies to Indocin, Chlor-Trimeton, sulfa, IVP dye, and penicillin. [Tr. at 85]

Plaintiff's "brief history" was summarized as:

# 1. Mixed connective tissue disease.

# 2. Exercise induced allergic and infectious asthma.

# 3. Perennial and seasonal allergic rhinitis and conjunctivitis.

**2.** Plaintiff testified at the hearing that "It'll be two years this May, I guess, I haven't worked." Tr. at 22. The ALJ attached no significance to the apparent discrepancy between that testimony and the March 30th date stated in plaintiff's application and disability report. Defendant, however, contends that the discrepancy somehow establishes that plaintiff's pain is not disabling. That contention is untenable.

**3.** Drs. Hull and Shoemaker, consultative physicians for the Secretary, stated that "The patient does complain of angina and a treadmill was requested. Patient does refuse at this time as she is unable to comply secondary to severe pain in her legs and weakness." Tr. at 133. The two "disability examiners" who filled out "disability determination rational" forms also cited plaintiff's "refusal" to undergo a "Graded Exercise test." Tr. at 76, 78. Plaintiff understandably formed the impression that she was being penalized for "refusing" to take that test

and, when asked by the ALJ whether she had any objection to his considering the exhibits in her file, plaintiff stated: "That was not refusing. The EKG was not refused but the walking the treadmill, I couldn't walk it. And I think further up, the doctor clarifies that." Tr. at 17.

It should be noted that § 4.00(G)(3) of Appendix 1 enumerates "Limitations of exercise testing." Those "limitations" include "unstable progressive angina pectoris," "uncontrolled severe hypertension," and "for individuals on medication where performance of stress testing may constitute a significant risk." The record indicates that Dr. Leider administered a treadmill test of plaintiff in June, 1979 with "equivocal or borderline results." Tr. at 88–89. Thus far he has apparently decided not to administer a second one.

# 4. Sinus headaches with post nasal drainage.

# 5. Hiatal hernia.

# 6. Hypertension.

# 7. Allergies to Indocin, Chlor-Trimeton, sulfa, IVP dye, and penicillin. [*Id.*]

Dr. Kohen reported that "Pulmonary function study showed her to have moderate small airways obstructive lung disease." Tr. at 86. He noted that "The patient was continuing to have pain while in the hospital as her evaluation proceeded, but she then did better on Prednisone just prior to discharge." On discharge, he prescribed "Prednisone 40 mg. every other morning. The patient was ambulatory and was told to return to work. She will be followed in the office." *Id.*

Plaintiff was readmitted to Halifax Hospital on January 22, 1980. Her diagnosis at that time was the same as stated earlier with the exception that it now stated "Rule out acute cholecystitis or pancreatitis." Tr. at 81. The "history sheet" filled out by Dr. Kohen recited that plaintiff had been previously admitted and discharged, and that: "She was then started on Prednisone, 40 m.g. every other day, which she took for the first time this morning. She has used Prednisone in the past without any adverse reactions. Then, last night, after a fried chicken dinner she began to develop severe abdominal pain which necessitated an Emergency room visit at about 3 A.M. The doctor in the Emergency Room was impressed enough by her abdominal pain to admit her to the hospital. The abdominal pain was dull, steady, to the right of the costal margin and radiated between both shoulder blades." *Id.* Dr. Kohen observed that plaintiff's joints were shown to be tender, but "all joints show full range of motion and good muscle strength is noted throughout." *Id.* at 82. That observation was consistent with Dr. Kohen's original evaluation of plaintiff on January 14, 1980. Tr. at 88.

Dr. Kohen referred plaintiff to Dr. Leider who also examined the plaintiff on January 14, 1980. Dr. Leider completed an "attending physician's statement," tr. at 89, in which he recounted that since 1978 plaintiff had been under his care for hypertension and chest pain. "She was scheduled to be admitted to the hospital by Dr. Kohen for investigation of the causes of her arthritis and allergy, however, on the night prior to her scheduled admission she developed a 25-minute episode of pain in the left chest, radiating to the left side of the neck, left shoulder, and left arm." *Id.* Dr. Leider continued: "The patient's description of the pain which she had prior to admission sounds like chest wall pain. She had a treadmill test done in my office 6–79 with equivocal or borderline results and it is difficult to ascertain for certain whether or not her chest pain is cardiac in origin and she may eventually have to have coronary angiography. I am keeping the patient on Inderal, Dyazide, and Slow K and will follow her with you." Tr. at 89–90.

More than three months later, on May 5, 1980, Dr. Kohen wrote a letter as follows:

Re. Betty Thompson

To whom it may concern:

Betty Thompson has mixed connective tissue disease that produces a great deal of weakness and muscular pain. This has been poorly controlled with medications to the present time and she has been referred to a Medical Center up North. I am awaiting their appointment for an evaluation. Until she is evaluated and controlled on appropriate therapy she should be considered totally disabled.

Thank you for your consideration in this matter.

Very truly yours,

/S/ Michael Kohen

Michael D. Kohen, M.D. [Tr. at 103]

Dr. Kohen apparently referred to the Shands Teaching Hospital and Clinic at the University of Florida in Gainesville (Halifax is in Daytona Beach). Plaintiff was admitted to Shands on December 10, 1980 and discharged on December 12, 1980. In a letter dated December 14, 1980 from James W. Wynne, M.D., Associate Professor, Department of Medicine, to Dr. Cohen (sic),

Dr. Wynne began by stating "We must apologize that we were unable at this visit to be of much benefit to Betty Thompson." He noted that "At the time of her admission here, none of her old records are available or any records of her admission in Daytona or in New York." Dr. Wynne continued:

The patient's complaints at the time of her admission here center around joint and muscle aching without any true swelling or erythema with stiffness and limitations of the range of movement. She has been tried on nonsteroidal antiinflammatory agents, as well as Aspirin, Gold, and Prednisone. At one point we are aware that she had a positive ANA and a positive ENA, however, was later told that these were negative on repeat. She has been given the diagnoses of rheumatoid arthritis, mixed connective tissue disease and lupus erythematosis. She had seen Dr. Richard Panush, Department of Rheumatology at the Shands Teaching Hospital, however, he is out of town at the time of this admission. She has also been seen in Cornell University by Dr. Christiansen, the results of this visit are unknown to us. The patient seems to have no predilection for large versus small joints, nor peripheral versus central. She actually can not describe any true arthritis, nor can she describe any true signs of weakness, although she complains of such. The patient has had no associated fevers, chills, alopecia or rash, Raynaud's phenomenon, dysphagia or diarrhea.

Past medical history is remarkable for transabdominal hysterectomy 20 years prior to admission and two C-sections. She had an appendectomy in 1948 and exploratory laparotomy secondary to adhesions. Her medical history is remarkable for Herpes zoster over her right flank for 10 years, occurring every three to four months and a five year history of hypertension. Medications on admission included Dyazide, two tablets, P.O. q.d. and Lasix 40 mg. P.O. q.d. Slo-K, 5 tablets, P.O. q.d. and Inderal 40 m.g. P.O. b.i.d. Allergies included Penicillin, Sulfa antihistamines and intravenous dye. There was a 30 pack year history of smoking. Tr. at 113

After discussing in detail the results of plaintiff's physical examination, Dr. Wynne concluded:

It was our feeling at the time of discharge that Mrs. Thompson had a complaint of arthralgias and myalgias, however, no good evidence that she had an arthritis, deforming arthritis. There was no evidence of scleroderma, polymyositis, Raynaud's disease or mixed connective tissue disease.

Discharge medications:
1. Dyazide, two tablets, P.O. q.d.
2. Lasix 40 mg. P.O. q.a.m.
3. Slo-K, 5 tablets, P.O. q.d.
4. Inderal, 40 mg. P.O. b.i.d.

Discharge diagnoses:
1. Hypertension.
2. Arthralgias, myalgias of unknown etiology.

On a Social Security form stamped August 20, 1981, Dr. Leider confirmed that plaintiff was still under his care for "H.C.V.D." and that he had prescribed "Inderal, Dyazide, Lasix and Slow K." Dr. Leider also stated that plaintiff was still being treated by Dr. Kohen for "a mixed connective tissue disease and arthritis" and that Dr. Kohen had referred her to "various specialty centers." Tr. at 117. He responded to similar effect on a Social Security form dated May 22, 1981. Tr. at 121–22.

On June 2, 1981, Dr. Kohen wrote a second letter, this one addressed to Arun D. Joshi, M.D., Medical Consultant of the Office of Disability Determinations, as follows:

Re: Betty Thompson

Dear Dr. Joshi:

Betty Thompson has been seen in a variety of rheumatology clinics. The diagnosis has varied. It was felt the University of Florida by Dr. Gerald Stein that she had joint pain on a non-rheumatologic basis. It was felt by Dr. Christian at Cornell

Medical School that she had arthalgia associated with herpes zoster infection. I have felt that she had mild lupus erythematosus. She in addition has hypertension. Laboratory tests show her to have an ANA repeated many times of 1:160 and an ANA at the Scripts Clinic in Lajolla, Callifornia of 1:16 which is a comparable titer in their laboratory. The patient can bear full weight on her lower extremities. I last saw her April 3, 1981. She was initially seen for complaints similar to this September, 1977. X-rays of her joints have been negative. She has been tried on a variety of treatments including gold, plaquenil, and non-steroidal anti-inflammatory drugs. At the present time she takes approximately 12 Bufferin a day. She has been developing gradually more severe joint pain and at the present time is disabled by this joint pain. She finds it difficult to move about and has prolonged stiffness of her joints but is able to walk.

If I can be of any further assistance, please do not hesitate to write. [Tr. at 127].

In a letter dated June 13, 1981, Drs. James R. Shoemaker, D.O., and James F. Hull, D.O., consultative physicians for the Secretary, wrote the Office of Disability Determinations outlining their joint conclusions from an examination of plaintiff.[4] Their report noted that "The patient does complain of angina and a treadmill was requested. Patient does refuse the treadmill at this time as she is unable to comply secondary to severe pain in her legs and weakness." Tr. at 133. *See* footnote 3,

supra.[5] Drs. Hull and Shoemaker then stated their "impressions" as follows:

1. Severe muscle and joint pain secondary to mixed connective tissue disease.

2. Essential hypertension, moderate and controlled.

3. Angina pectoris with equivocal stress test in June, 1979.

4. Lower gingival ulcer secondary to denture irritation.

## II.

The ALJ's "decision" stated that:

The general issue before the Administrative Law Judge is whether the claimant is entitled to Widow's Insurance Benefits, based on disability, under Sections 202(e) and 223, respectively, of the Social Security Act, as amended. All other factors of entitlement having been met, the specific issue for decision is whether the claimant is under a "disability" as defined in Sections 223(d)(1)(A) and 223(d)(2)(B) of the Act and, if so, when such disability commenced and the duration thereof. [Tr. at 5]

The ALJ briefly summarized the evidence in the record, and then concluded:

A review of the *medical evidence* indicates that the *clinical and laboratory findings* have failed to establish any evidence of active rheumatoid arthritis or any other inflammatory arthritis. She suffers joint pain but she still retains full range of motion of all joints and is capable of full weight bearing. With respect

4. It seems from that joint report that Drs. Hull and Shoemaker personally examined the plaintiff. Yet in support of her "request for review of hearing decision/order," plaintiff stated: "In the hearing, records showed I saw Dr. Shoemaker. I never saw this doctor. My Doctor, Dr. Kohen, states I am not able to work. I feel I am unable to work at all. On 1/21/82 I will be going for another test at K.U. Med. Ctr." Tr. at 3. It may be that only Dr. Hull examined the plaintiff but both doctors concurred in the results.

5. In what appears to be a form letter, dated October 8, 1981, Dollie Marshall, Hearing Assistant to Henry V. Snavely, Administrative Law Judge, requested Dr. Leider to fill out an enclosed "physical capacities evaluation" form. On the bottom of Ms. Marshall's letter, Dr. Leider replied in longhand:

Dear Madam:
This form is an impossibility. I could only guess at the answers as I do not have my patients lift weights, squat, bend, etc. Also, I do not test their ability to inhale fumes, drive, etc." [Tr. at 138]

to her history of high blood pressure, this condition is controlled medically and there is no evidence of significant end-organ damage. *I have compared* the claimant's *medically documented impairments and symptoms with those listed in the pertinent regulations.* The Listing of Impairments includes impairments to the musculoskeletal system in Item 1.00 and also in Item 10.04 (Multiple Body Systems). *However, the objective medical findings concerning Mrs. Thompson's current condition do not meet or equal such listings.* Furthermore, the medical evidence also fails to demonstrate that Mrs. Thompson's impairment meets or equals the listings in Item 4.00 which relate to the cardiovascular system. The combined effect and limitations caused by her multiple maladies, and for which she has been treated, have also been fully considered. In combination, the claimant's impairments do not appear to be of the same degree of severity or equal to any of the listed impairments. *Finally, the physicians designated by the Secretary have concluded that the claimant's impairments do not meet the regulatory requirements for total disability. I, therefore, have no alternative but to find that the claimant is not entitled to Widow's Insurance Benefits under the Social Security Act, as amended, at any time on or prior to the date of this decision.* [Tr. at 8] (emphasis added)

The ALJ made the following specific findings:

4. The medical findings shown by a preponderance of the medical evidence of record indicate that the claimant suffers from multiple arthralgias possibly associated with mild lupus erythematosus; essential hypertension, and angina pectoris.

5. The medical evidence of record does not reveal the same attendant medical findings with respect to the above impairments as are recited in the Listing of Impairments in Appendix 2, subpart P of Social Security Regulations No. 4, for such impairments.

6. The medical evidence of record establishes that the medical findings with respect to the claimant's impairments are not equivalent in severity and duration to the findings of any impairments listed in the Appendix to Subpart P. Therefore, the claimant's impairments, considered singly or in combination, are not medically the equivalent [sic] of the listed impairments.

7. The medical evidence of record fails to establish that at any time prior to the date of this decision, the claimant's impairments were of a level of severity, which under regulations prescribed by the Secretary, is deemed sufficient to preclude an individual from engaging in any gainful activity. [Tr. at 9]

In support of its "motion for summary judgment or in the alternative, motion for judgment on the pleadings," defendant contends that "A widow's claim of disability is judged solely by medical criteria." It is true that in a claim for widow's insurance benefits under 42 U.S.C. § 423(d)(2)(A), nonmedical factors such as age, education and work experience are not to be considered. It is not accurate, however, to conclude that only "objective medical criteria" are relevant to a widow's disability claim. See *Woodard v. Schweiker,* 668 F.2d 370, 374 & n. 4 (8th Cir.1981); *Brand v. Secretary of Dept. of Health, Educ. and Welfare,* 623 F.2d 523, 526 (8th Cir.1980); *Landess v. Weinberger,* 490 F.2d 1187, 1190 (8th Cir.1974). The ALJ's decision clearly overemphasized the need for objective medical evidence. *See Northcutt v. Califano,* 581 F.2d 164, 166 (8th Cir.1978), recently followed in *Tucker v. Schweiker,* 689 F.2d 777, 781 (8th Cir.1982), and even more recently followed in *Nicks v. Schweiker,* 696 F.2d 633 (8th Cir.1983) and *McDonald v. Schweiker,* 698 F.2d 361 (8th Cir.1983). *And see Monteer v. Schweiker,* 551 F.Supp. 384, 389 (W.D.Mo.1982).

Defendant also asserts that "the report of a medical advisor, who has not examined a claimant but who has examined the medical evidence of record and rendered an opinion as to the medical equivalence of plaintiff's impairments, is proper and has been held to constitute substantial evidence to support the Secretary's denial of widow's disability benefits. *Richardson v. Perales,* 402 U.S. 389, 91 S.Ct. 1420, 28 L.Ed.2d 842 (1971); *Petruzzi v. Weinberger,* 394 F.Supp. 182 (W.D.Pa.1975); *Zanoviak v. Finch,* 314 F.Supp. 1152 (W.D.Pa.1970)." *Richardson,* on its facts, held that "a written report by a licensed physician *who has examined the claimant* and who sets forth in his report his medical findings in his area of competence ... may constitute substantial evidence supportive of a finding by the hearing examiner adverse to the claimant ...." 402 U.S. at 402, 91 S.Ct. at 1427 (emphasis added). *Richardson* does not support the broad proposition advanced by the defendant.

The ALJ reasoned that "the physicians designated by the Secretary have concluded that the claimant's impairments do not meet the regulatory requirements for total disability. I, therefore, *have no alternative* but to find that the claimant is not entitled to Widow's Insurance Benefits ...." (emphasis added). In considering himself bound by the conclusions of the Secretary's designated physicians, the ALJ effectively abdicated his decision-making role. *Woodard v. Schweiker,* 668 F.2d 370, 373 (8th Cir.1981).

Moreover, the disability examiners upon whom the ALJ so heavily relied never personally examined the plaintiff.[6] Their reports are entitled to little weight, especially as compared with the recommendations of plaintiff's treating physician, Dr. Kohen. *Woodard v. Schweiker,* 668 F.2d at 374;

*McCoy v. Schweiker,* 683 F.2d 1138, 1147 n. 8 (8th Cir.1982); and *Landess v. Weinberger,* 490 F.2d at 1190.

Dr. Kohen twice stated his clinical judgment that plaintiff was totally disabled. Each time he candidly advised the Secretary of the course of plaintiff's treatment. On May 5, 1980, Dr. Kohen wrote that plaintiff should be considered totally disabled at least until such time as an adequate treatment might be devised to alleviate her symptoms which included "a great deal of weakness and muscular pain." Tr. at 133. On June 2, 1981, Dr. Kohen recounted the dubious results of repeated efforts to diagnose plaintiff's condition since 1977 and again expressed his clinical judgment that plaintiff "has been developing gradually more severe joint pain and at the present time is disabled by this joint pain." Tr. at 127. Nothing in the record contradicts Dr. Kohen's assessment and indeed the record as a whole strongly supports it.

Plaintiff contends that the ALJ also erred in concluding that plaintiff's ailments were not "listed." We note that plaintiff's symptoms and the test results as stated in Dr. Kohen's letter of June 2, 1981 do appear entirely consistent with listing § 10.04 of Appendix I.[7] Nevertheless, we do not base our decision on that contention. Rather, we find and conclude that it was error for the ALJ to conclude that application of specific "listings" required a finding that plaintiff was not disabled despite the fact that plaintiff's treating physician and the several specialists who separately examined her were unable to agree upon a reasonably conclusive diagnosis.

As Chief Judge Lay observed in *Landess v. Weinberger, supra,* "Medical diagnosis is seldom an exact science." 490 F.2d, at 1189. Yet the ALJ did not properly measure plaintiff's combined exertional and

---

**6.** The ALJ could not have been referring to Drs. Hull and Shoemaker for they made no recommendations whatever in regard to whether plaintiff met the "regulatory requirements." See. Tr. at 130–33.

**7.** 20 C.F.R. Appendix 1, § 10.04:

*Disseminated lupus erythematosus (established by a positive LE preparation or biopsy or positive ANA test).* With frequent exacerbations demonstrating involvement of renal or cardiac or pulmonary or gastrointestinal or central nervous systems.

nonexertional impairments in terms of her "total physiological well-being." *Id.* at 1190. We are satisfied that application of the appropriate legal standard and giving due deference to the judgment of plaintiff's treating physician would require that plaintiff's combined impairments be found "equivalent" to the disabling impairments enumerated in the "Listing of Impairments," and that plaintiff be found permanently and totally disabled within the meaning of Section 223(d)(2)(B) of the Social Security Act, 42 U.S.C. § 423(d)(2)(B).

Outright reversal is justified in this circumstance because there is no substantial evidence to support a finding that the claimant is not totally disabled, *Jackson v. Schweiker,* 696 F.2d 630 at 631 n. 1 (8th Cir.1983); *Stephens v. Secretary of HEW,* 603 F.2d 36, 42 (8th Cir.1979), and "a rehearing would simply delay receipt of benefits." *Tennant v. Schweiker,* 682 F.2d 707, 710 (8th Cir.1982), *quoting Lewin v. Schweiker,* 654 F.2d 631, 635 (9th Cir.1981).

### III.

Accordingly, it is

ORDERED (1) that summary judgment should be and the same is hereby granted in favor of the plaintiff. It is further

ORDERED (2) that the final decision of the Secretary should be and the same is hereby reversed and remanded with directions to distribute widow's insurance benefits to the plaintiff in accordance with her application.